# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHAUN GREENE,
4720 Babukia Drive.
Salt Lake City, UT 84117,

LINN BAKER,
5299 Sunset Lop Road,
Bountiful, UT 84010,

JOHN E. BRAUN,
2547 South 1875 West,
Syracuse, UT 84075,

DOUGLAS R. SMITH,
5986 South Tolcate Woods Lane,
Salt Lake City, UT 84121,

NATHAN JOHNS,
1048 West 2760 North,
Pleasant Grove, UT 84062,

JON WUNDERLI,
1291 South Wasatch Drive,
Salt Lake City, UT 84102,

FERRIS TAYLOR,
602 Draper Heights Way,
Draper, UT 84020,

DENNIS KUNIMURA,
555 N. Allanwood Place,
Layton, UT 84040,

JOHN STOHL,
2726 Wasatch Drive E,
Salt Lake City, UT 84108,

ALAN THURGOOD,
1075 Grants Lane,
Syracuse, UT 84075,

Civil Action No.:
1:22-cv-1452

MARK TUTTLE,
3420 Coach Lane, #11,
Cameron Park, VA 95682,

ROBERTA LOUISE HERZBERG,
10479 S. Dimple Dell Road,
Sandy, UT 84092,

ROD CASTILLO,
731 Sand Dollar Drive,
Sandy, UT 84094,

ALISON LOONEY AKA ALISON SWILLINGER,
1212 E. Yale Avenue,
Salt Lake City, UT 84105,

CHELSEA SLOAN CARROLL,
39 E. Eagle Ridge Drive, Suite 100,
North Salt Lake, UT 84054,

DAVID NIELSON SUNDWALL,
4948 South 1021 East,
Salt Lake City, UT 84117,

TRICIA LOUISE MCGARRY SCHUMANN,
1553 E. Connecticut Drive,
Salt Lake City, UT 84103,

                              Plaintiffs,

              - vs -

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES,
200 Independence Avenue, S.W.,
Washington, DC 20001,

                              Defendant.

**Complaint for declaratory and injunctive relief**

This is an action for declaratory and injunctive relief under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, challenging a decision of the Department of Health and Human Services ("DHHS") refusing to allow two former DHHS employees – Joan A. Peterson, Ph.D. and Kevin J. Counihan – to provide critical deposition testimony in connection with a suit pending in Utah state court ("the Underlying Action") in which the plaintiff is seeking over $130 million in damages from officers and directors ("D&Os") of Arches Mutual Insurance Company.

The D&Os' multiple requests for deposition testimony from the two former DHHS employees – over the course of five months – was in accordance with DHHS's *Touhy* regulations at 45 C.F.R. § 2.4. The D&Os explained that Arches was a Consumer Operated and Oriented Plan ("CO-OP") created under the Affordable Care Act and backstopped by DHHS's startup and solvency loans. The D&Os explained that Dr. Peterson was the first, and only, CO-OP Program Manager for the Arches Account and that, in that capacity, she oversaw its performance while communicating about Arches with auditors and other regulators and overseeing its loan.

The D&Os accordingly showed that Dr. Peterson had critical information about Arches' management that was not available from any other witness, and which would further the DHHS's interests by rebutting the assertion that its regulation and investigation of Arches improperly caused Arches' liquidation, providing insight into the actual reason for Arches' liquidation, and providing information necessary to avoid a similar failure from happening again.

-3-

The D&Os further showed that Mr. Counihan communicated with insurance regulators regarding DHHS's regular meetings with issuers and state officials, DHHS's recognition that the Affordable Care Act required HHS to make full risk-corridor payments to issuers, and that DHHS was "focused on . . . issuer solvency." The D&Os further showed that Mr. Counihan had had critical information about why DHHS did not make full risk-corridor payments and why Arches was placed into liquidation within six months after his letter, despite DHHS's focus on issuer insolvency; that this information was not available from any other witness; and that this testimony would further the DHHS's interests by rebutting the assertion that its regulation and investigation of Arches improperly caused Arches' liquidation, providing insight into the actual reason for Arches' liquidation, and providing information necessary to avoid a similar failure from happening again.

Despite this, the DHHS has refused to make its former employees available for deposition, necessitating this suit.

## Jurisdiction and venue

1.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because the claims arise under the APA and because an agency of the United States is a defendant. Jurisdiction is also proper in this Court under the Declaratory Judgment Act, 28 U.S.C. § 2201, and under the APA, 5 U.S.C. §§ 701-706.

2.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because this is an action against an agency of the United States, defendant DHHS resides

in this judicial district, and, upon information and belief, a substantial part of the events

giving rise to this action occurred in this judicial district.

## Parties

3.      Plaintiffs are former officers and directors of Arches Mutual Insurance

Company. They are currently defendants in *Stillman Consulting Services, Inc. v. Greene,*

*et al.*, No. 200904045, filed and pending in the Third Judicial District Court of Salt Lake

County, Utah, in which Stillman Consulting Services, Inc., after it was appointed by the

Utah Insurance Department to liquidate Arches Mutual Insurance Company, seeks over

$130 million in damages from the D&Os for their alleged breaches of fiduciary duties

owed to Arches Mutual Insurance Company.

4.      Defendant DHHS is an agency of the United States Government, with its

principal office in Washington, D.C. Neither DHHS nor the DHHS's Centers for

Medicare and Medicaid Services ("CMS") is a party to the Underlying Action.

## Factual background

5.      The purpose of the Affordable Care Act was to create a health insurance

marketplace for individuals and companies that was both affordable and which covered

conditions that were excluded under other insurance policies.

6.      The Affordable Care Act had special provisions for the creation of

Consumer Owned and Operated Plans ("CO-OP"), which were new insurance companies

that would offer Affordable Care Act-compliant policies in the individual and small

business markets.

7.      Arches was formed in 2012 as one such CO-OP.

8.      Arches and the other CO-OPs would not have been formed or funded and operated without DHHS's management of the CO-OP program. The risk of operating the CO-OPs (including Arches) under the Affordable Care Act was backstopped by DHHS's startup and solvency loans.

9.      To provide capital for startup costs and reserves, on June 27, 2012, Arche entered into a loan agreement with DHHS for a startup loan of $10,106,603, paid in two installments, and a solvency loan of $79,544,300.

10.      DHHS requested that Arches price its health insurance plans very inexpensively and required that Arches began providing coverages on an extremely compressed timetable. To ensure the survival of Arches during the initial three years of operation, when HHS knew and planned for that Arches would lose money, HHS provided a "Risk Corridor" program to make annual "adjustment" payments for losses.

11.      For Arches to qualify for the DHHS loans, DHHS had to approve Arches' financial plans and projections and, after approval, DHHS managed Arches' performance as a CO-OP.

12.      Joan A. Peterson, Ph.D. was the first – and only – CO-OP Manager for the Arches account. Dr. Peterson and Mr. Counihan assisted Arches in applying for the loans; created and approved the financial reporting process; and managed Arches' performance as a CO-OP.

13.      Until mid-2015, DHHS gave oral and written assurances to Arches and the Utah Insurance Department ("UID") that the Risk Corridor payments would be paid in full. However, in September 2015, DHHS informed Arches that the Risk Corridor would

be converted to a "revenue neutral" payments basis and it would only pay a small fraction of the Risk Corridor payments.

14.     The conversion to revenue-neutral payments caused the National Association of Insurance Commissioners ("NAIC") to require Arches to write-down the Risk Corridor receivable and meant that Arches no longer met the required Risk Based Capital standards (the "DHHS Conversion"). Because of the DHHS Conversion, the liquidation action was filed against Arches.

15.     In the Underlying Litigation, Stillman Consulting described the integral role played by DHHS in its oversight of Arches, including reviewing and auditing Arches' financials, governance, and its filings with the Utah Insurance Department. *See* Exhibit 1 at ¶ 42.

16.     In the Underlying Litigation, Stillman Consulting referenced DHHS' retention of third parties who provided reports and audits of Arches, including Larson & Company, PricewaterhouseCoopers, and Actuarial Group, Inc. *See* Exhibit 1 at ¶¶ 43(a)-(f).

17.     In the Underlying Litigation, Stillman Consulting alleges that the DHHS "provided a level of reinsurance to Arches. That is, once claims related to an individual reached a certain level, the federal reinsurance would reimburse a portion of the claims paid by Arches." *See* Exhibit 1 at ¶ 64.

18.     In the Underlying Litigation, Stillman Consulting references multiple communications and reports that alerted, or should have alerted, DHHS to potential problems at Arches. *See* Exhibit 1 at ¶ 65(a).

19.     In the Underlying Litigation, Stillman Consulting references multiple

DHHS' communications regarding the Arches' projections, milestones, and reports.

Exhibit 1 at ¶¶ 65-66.

20.     In the Underlying Litigation, Stillman Consulting faults the D&Os for

failing to identify, evaluate, and monitor the possible failure of the Risk Corridor funding

under the Affordable Care Act. Exhibit 1 at ¶ 73.

21.     In the Underlying Litigation, the D&Os have maintained that DHHS'

decision to stop making full Risk Corridor payments, and its regulation and investigation

of Arches, improperly caused Arches' liquidation.

22.     By letter dated October 1, 2021, the D&Os, by their counsel, sent the

DHHS a *Touhy* letter, requesting that DHHS produce multiple categories of documents

sought by an accompanying subpoena. Exhibit 2. While some minor issues may remain,

DHHS thereafter largely produced the documents requested in the subpoena. Those

document requests are not at issue in this lawsuit.

23.     By letter dated December 14, 2021, the D&Os, by their counsel, sent the

DHHS a subpoena for the deposition of former DHHS employee Kevin J. Counihan, and

explained in an accompanying letter why they needed to take his deposition:

> The directors and officers of Arches that we represent (the
> "Clients") contend that Arches was improperly ordered into
> liquidation, in part, as a result of DHHS's and UDI's
> regulatory and investigative activities. For example, on July
> 21, 2015, Counihan sent a letter to UDI and described
> DHHS's regular meetings with issuers and state officials,
> DHHS's recognition that the Affordable Care Act required
> HHS to make full risk-corridor payments to issuers, and that
> DHHS was "focused on . . . issuer solvency." From his letter,

it appears that Counihan would be a DHHS employee with knowledge concerning whether DHHS had regular meetings with Arches. However, in Counihan's deposition, the Clients would investigate Counihan's knowledge regarding the number and content of meetings between DHHS and Arches. Similarly, although Counihan's letter stated that DHHS was required to make full risk-corridor payments, DHHS did not make full risk-corridor payments and, in Counihan's deposition, the Clients would inquire as to the reasons the payments were not made. Finally, the Clients would seek Counihan's testimony concerning the reasons Arches was placed into liquidation within six months after his letter, despite DHHS's focus on issuer insolvency.

Therefore, the above-described testimony that the Clients would seek from Counihan does not appear to be available from any other witness, unless Counihan in his deposition identifies other DHHS employees with knowledge who should be deposed, and it would be in the best interest of DHHS to explain the reasons that its regulation and investigation of Arches did not improperly cause Arches's liquidation.

Exhibit 3.

24.    By letter dated December 22, 2021, the plaintiffs, by their counsel,

explained why they needed to take the deposition of former DHHS employee Joan A.

Peterson, Ph.D.:

The directors and officers of Arches that we represent (the "Clients") have advised us that DHHS created a CO-OP Program Account for Arches and that Dr. Peterson was the first and only CO-OP Program Manager for the Arches Account. For example, during mid-2015, Dr. Peterson participated in the communications between DHHS and Arches concerning Arches' NAIC filings, monthly cash flow and burn rate, accounts receivable and payable, rate filings, and projected financial outcomes. In addition, Dr. Peterson reviewed drafts of reports from Deloitte Financial Advisory Services, LLP ("Deloitte") concerning the viability and ability of Arches to conduct ongoing operations, especially

> Dr. Peterson's participation in Deloitte's on-site visit during
> November 2015. In Dr. Peterson's deposition, the Clients
> would investigate her knowledge regarding the number and
> content of her communications with Arches concerning these
> matters. Simply put, Dr. Peterson is the only person to ever
> serve as Program Manager for the Arches Account and, as
> such, possesses unique information about the relationship
> between CMS and Arches, which information Arches cannot
> attain from anyone else.

Exhibit 4.

25.     In an email dated January 4, 2022, Scott S. Driggs, DHHS's Chief Counsel

for Region VII, took the position that the information sought by the D&Os via the

proposed depositions of former DHHS employees Peterson and Counihan, was publicly

available. Exhibit 5. However the publicly available resources identified by DHHS were

basic fact sheets and frequently asked questions about the CO-OP program, links to

regulations, reports about past payments, and other general documents having nothing to

do with Arches or the specific issues in the Underlying Litigation. *Id.*

26.     By letter dated February 8, 2022, the D&Os, by their counsel, again

identified the many topics upon which former DHHS employee Peterson was the only

individual with knowledge and which were not publicly available elsewhere:

>  (a)    Requests and recommendations CMS made to the D&Os for Arches
>         to obtain approval for the "Grant Application" for the CO-OP
>         program.
>
>  (b)    Requests and recommendations CMS made to the D&Os to submit
>         an amended "Grant Application" for the CO-OP program.
>
>  (c)    The "Scoring" and "Pass" reports issued by Deloitte Consulting to
>         CMS which recommended that Arches be approved as a CO-OP.

(d)    The requests and recommendations CMS made to the D&Os for the "Application for Additional Funding" that the D&Os submitted to CMS.

(e)    The report CMS obtained from Navigant titled "Assessment of Additional Funding Request Submitted by Arches Mutual Insurance Company."

(f)    The "PWC Audit" report of Arches obtained by CMS.

(g)    Email correspondence concerning the meetings, usually once a week, between Dr. Peterson and the D&Os.

(h)    The CMS document titled "Arches Mutual Insurance Company Profile" (as of February 7, 2015).

(i)    The requirement that CMS approve the officers proposed by Arches, including their salaries.

(j)    The "Final Report on CO-OP Performance" prepared by KPMG for CMS.

(k)    "The Consumer Operated and Oriented Plans (CO-OP) Loan Technical Assistance and Risk Management" which provided a financial assessment of Arches prepared by Deloitte Consulting.

(l)    CMS's letter to Arches and requests that the D&Os provide cash flow, burn rate, days of cash on hand, A/R and Aging reports, and 2016 rate filings.

(m)    CMS's payment declaration titled "Risk Corridors Payment Proration Rate for 2014" issued on October 1, 2015.

(n)    The "Arches Site Visit Report" jointly issued by Deloitte Consulting and CMS.

(o)    The "Talking Points on Health Insurance CO-OPs" updated during July 2016.

(p)    CMS's emails concerning the "CO-OP Wind Down Plan," including a chart of unpaid Risk Corridor balances.

Exhibit 6.

27.     In that same February 8, 2022 letter, the D&Os, by their counsel, explained

that former DHHS employee Counihan also possessed information that could not be

discovered elsewhere:

> He wrote two letters, one in February of 2015 and another in
> July of 2015 to, we believe, the insurance regulators of the
> states where ACA CO-OPs were formed and where
> incumbent insurers on the Exchange were operating regarding
> the likely payment of the risk corridor and other 3R program
> benefits under circumstances that existed at that time. We
> have no other way to obtain the full text and background of
> those letters and to lay an evidentiary foundation for them and
> testimony surrounding them other than through Mr.
> Counihan.

Exhibit 6.

28.     In an email sent on March 2, 2022, the DHHS abandoned its position that

the information sought from former DHHS employees Peterson and Counihan was

publicly available elsewhere, and instead took the position that the D&Os had not

explained "how the testimony would promote the objectives of HHS." Exhibit 7. In that

same email, the D&Os were told to direct further communications to Ellen Montz, Ph.D,

who serves as the CMS Deputy Administrator of the Center for Consumer Information

and Insurance Oversight. *Id.*

29.     On March 22, 2022, the D&Os, by their counsel, sent Dr. Montz a letter in

which they showed why the critical testimony of former DHSS employees Peterson and

Counihan would promote the objectives of HHS:

> Arches and the other CO-OPs would not have been formed
> nor funded and operated Arches without HHS's management

-12-

of the CO-OP program. The risk of operating the CO-OPs (including Arches) under the ACA was backstopped by HHS's startup and solvency loans and the Three Rs Programs. HHS requested that Arches price its health insurance plans very inexpensively and required that Arches began providing coverages on an extremely compressed timetable. To ensure the survival of Arches during the initial three years of operation, when HHS knew and planned for that Arches would lose money, HHS provided a "Risk Corridor" program to make annual "adjustment" payments for losses.

For Arches to qualify for the HHS loans, HHS had to approve Arches' financial plans and projections and, after approval, HHS managed Arches' performance as a CO-OP. Dr. Peterson was Arches' first and only CO-OP program manager and she and Mr. Counihan assisted Arches in applying for the loans, created and approved the financial reporting process, and managed Arches' performance as a CO-OP. Until mid-2015, HHS gave oral and written assurances to Arches and the Utah Insurance Department that the Risk Corridor payments would be paid in full. However, in September 2015 HHS informed Arches that the Risk Corridor would be converted to a "revenue neutral" payments basis and it would only pay a small fraction of the Risk Corridor payments. The conversion to revenue-neutral payments caused the National Association of Insurance Commissioners ("NAIC") to require Arches to write-down the Risk Corridor receivable and meant that Arches no longer met the required Risk Based Capital standards (the "HHS Conversion").

The HHS Conversion was the reason that the UID offers for filing the liquidation action against Arches. In Stillman's lawsuit against the D&Os, Stillman did not, nor was it required, to sue HHS, but its failure to mention the HHS Conversion is an obvious attempt to unfairly shift all the blame to the D&Os have persuasive damages defenses, at trial the D&Os will defend Stillman's liability claims by offering the testimony of numerous fact and expert witnesses to prove that the HHS Conversion was the reason for the conditions which caused the filing of the liquidation action.

> Arches' intention to show that the HHS Conversion was a
> primary factor leading to the liquidation action satisfies the
> requirement of 45 CFR §2.4(a) that HHS have an interest in
> the testimony of Dr. Peterson and Mr. Counihan. Although
> HHS will not be a party at trial, HHS should have an
> overwhelming interest in offering evidence, if there is any,
> that HHS's employees were competent, honest, and there was
> a legitimate reason to not pay the promised Risk Corridor
> payments.

Exhibit 8.

30.     In that same March 22, 2022 letter, the D&Os, by their counsel, again

explained why the critical testimony of former DHSS employees Peterson and Counihan

was not available elsewhere by public means: "the D&Os do not have any publicly-

available documents providing a reasonable explanation for the reason that HHS

suddenly decided to not pay the Risk Corridor payments, despite prior oral and written

assurances they would be paid." Exhibit 8.

31.     In the same March 22, 2022 letter, the D&Os, by their counsel, again

explained why the critical testimony of former DHSS employees Peterson and Counihan

was not available elsewhere by public means:

> Although not required by 45 CFR §2.4(a), to assist you in
> considering our Touhy request, we have provided the other
> categories of testimony by Dr. Peterson and Mr. Counihan,
> unavailable by any other means, as described in Stillman's
> lawsuit. Specifically, the D&Os intend to obtain testimony
> from Dr. Peterson and Mr. Counihan to dispute the following
> allegations in the Second Amended Complaint:
>
> HHS's audit discovered significant problems,  inaccuracies,
> errors, and omissions.
>
> HHS engaged PricewaterhouseCoopers to conduct a
> performance audit of Arches and the audit report described

-14-

> Arches' failure to: comply with the HHS loan agreement, comply with state and federal regulations, and follow proper financial and corporate procedures.
>
> HHS engaged Actuarial Group, Inc. to review Arches' governance and the report identified numerous instances of failed corporate governance.
>
> Arches made false statements to HHS regarding Arches' financial performance.

Exhibit 8.

32.     In the same March 22, 2022 letter, the D&Os, by their counsel, showed that only former DHSS employees Peterson and Counihan could provide admissible testimony about certain topics and documents:

> In addition, Dr. Peterson and Mr. Counihan will have to be deposed concerning multiple documents because the purpose and meaning of them is not clear and they are inadmissible without a witness to authenticate them.  Examples of these records are listed below:
>
> The "Grant Application" for the CO-OP program.
>
> The amended "Grant Application" for the CO-OP program.
>
> The "Scoring" and "Pass" reports issued by Deloitte Consulting to CMS which recommended that Arches be approved as a CO-OP.
>
> The "Application for Additional Funding" that the D&Os submitted to CMS.
>
> The report CMS obtained from Navigant titled "Assessment of Additional Funding Request Submitted by Arches Mutual Insurance Company."
>
> The "PWC Audit" report of Arches obtained by CMS.

Email correspondence concerning the meetings, usually once
a week, between Dr. Peterson and the D&Os.

The CMS document titled "Arches Mutual Insurance
Company Profile" (as of February 7, 2015).

The "Final Report on CO-OP Performance" prepared by
KPMG for CMS.

"The Consumer Operated and Oriented Plans (CO-OP) Loan
Technical Assistance and Risk Management" which provided
a financial assessment of Arches prepared by Deloitte
Consulting.

CMS's letter to Arches and requests that the D&Os provide
cash flow, burn rate, days of cash on hand, A/R and Aging
reports, and 2016 rate filings.

CMS's payment declaration titled "Risk Corridors Payment
Proration Rate for 2014" issued on October 1, 2015.

The "Arches Site Visit Report" jointly issued by Deloitte
Consulting and CMS.

The "Talking Points on Health Insurance CO-OPs" updated
during July 2016.

CMS's emails concerning the "CO-OP Wind Down Plan,"
including a chart of unpaid Risk Corridor balances.

Exhibit 8.

33.    By letter dated May 19, 2022, the DHHS denied the D&O's *Touhy* requests

for the depositions of former DHHS employees Peterson and Counihan. Exhibit 9. The

DHHS concluded that:

Neither Mr. Counihan, as former Director of the Center for
Consumer Information and Insurance Oversight (CCIIO), nor
Joan Peterson, as former Account Manager for the loan to
Arches, could attest with any particular authority about CO-
OP audits. Mr. Counihan and Ms. Peterson had at most

peripheral involvement in the grant application, Deloitte
reports concerning the application, any applications for
additional funding, and the CO-OP loan agreement itself.

Exhibit 9.

34.     The knowledge and information in the possession of former DHHS
employee Counihan is critical to the D&Os ability to meaningfully respond to Stillman
Consulting's claims because he has unique knowledge about why Arches was ordered
into liquidation; whether Arches was ordered into liquidation, in part, as a result of
DHHS's and UDI's regulatory and investigative activities; why DHHS did not make full
risk-corridor payments after Counihan wrote, in July 2015, to UDI that the Affordable
Care Act required HHS to make full risk-corridor payments to issuers, and that DHHS
was "focused on . . . issuer solvency," that is not publicly available elsewhere.

35.     The knowledge and information in the possession of former DHHS
employee Peterson is critical to the D&Os ability to meaningfully respond to Stillman
Consulting's claims because she was the first – and only – CO-OP Manager for the
Arches account. She was singularly responsible for communications between DHHS and
Arches concerning Arches' NAIC filings, monthly cash flow and burn rate, accounts
receivable and payable, rate filings, and projected financial outcomes; reviewing reports
from Deloitte Financial Advisory Services, LLP concerning the viability and ability of
Arches to conduct ongoing operations; participating in Deloitte's on-site visit during
November 2015; requests and recommendations CMS made to the D&Os for Arches to
obtain approval for the CO-OP program and for funding; reports issued by Deloitte
Consulting to CMS which recommended that Arches be approved as a CO-OP; reports

issued by Navigant, PWC, KPMG, and Deloitte regarding the performance of CO-OPs and/or Arches; regular meetings with the D&Os; CMS's documents and communications with or regarding Arches, cash flow, burn rate, days of cash on hand, A/R and aging reports, 2016 rate filings and the "CO-OP Wind Down Plan; CMS's requirements regarding the selection and approval of Arches' D&Os and their salaries, among other topics.

36.     The DHHS has an interest in explaining the reasons that its regulation and investigation of Arches did not improperly cause Arches's liquidation; that its employees were competent, honest, and there was a legitimate reason to not pay the promised Risk Corridor payments; and that the true reason for Arches' liquidation come to light, as well as the circumstances regarding its oversight, so that a similar failure does not happen again.

37.     The DHHS's rejection of the D&O's requests is arbitrary, capricious, an abuse of discretion, contrary to DHHS's own regulations, and contrary to law.

38.     The DHHS's rejection of the D&O's requests constitutes a final agency action for which there is no other adequate remedy in a court.

## CLAIM FOR RELIEF

## DEFENDANTS' REFUSAL TO PERMIT THE DEPOSITIONS OF THE FORMER EMPLOYEES IS ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION, AND CONTRARY TO LAW

39.     Paragraphs 1 to 38 are incorporated as if fully set forth herein.

40.     Defendants' refusal to permit plaintiffs to depose former DHHS employees Peterson and Counihan should be set aside because that decision is arbitrary, capricious, an abuse of discretion, and contrary to law.

41.     As a direct result of DHHS' refusal to permit the depositions to go forward, plaintiffs (the Directors and Officers named as defendants in the Underlying Litigation) are deprived of their opportunity to obtain evidence that is of central importance to their ability to defend themselves against allegations brought by Stillman Consulting in the Underlying Litigation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

(1)     Issue a declaratory judgment that DHHS' refusal to permit the depositions sought by plaintiffs is arbitrary, capricious, and abuse of discretion, and contrary to law;

(2)     Set aside DHHS' final agency action refusing to permit the depositions sought by plaintiffs to proceed;

(3)     Issue an injunction compelling DHHS to permit the depositions sought by plaintiffs to proceed; and

(4)     Grant such other and further relief as the Court deems just and proper.

Dated:   May 24, 2022                          Respectfully submitted,


                                               */s/ Leslie Paul Machado*
                                               Leslie Paul Machado (Bar No. 472395)
                                               O'Hagan Meyer PLLC
                                               2560 Huntington Avenue, Suite 204
                                               Alexandria, Virginia 22303
                                               (703) 775-8607 (phone)

(804) 403-7110 (facsimile)
lmachado@ohaganmeyer.com

***Counsel for Plaintiffs***